So well-argued, very helpful, and we'll take them out of our advisement. Thank you. We'll call our next case, AG, at Marine Aviation versus Cassin et al. Thank you. Cassin, are you there? Mm-hmm. May it please the court, my name is Alexandra Bartsch, and I represent CIT in this case. I'd like to reserve five minutes for rebuttal. CIT has financed the purchase of a yacht, Falcon, involved in this action, and we're going to reverse the district court, because this case should be governed by Virgin Islands law, not the ancient insurance fraud rule of ubermae fide, and because even if ubermae fide applies, issues of material fact remain with respect to that doctrine, which should have precluded summary judgment. But there's a choice of law provision in the policy that very clearly states what law should be applied, and no one has said in the briefs why it doesn't prevail. Yes, Your Honor, we did address that in the briefs, and we also cited law in the binder, which was issued in several months before. The policy was effective in April. The binder was issued, I think, in June. And the insurance policy was not submitted until seven months into the policy period in October of 2000, just a month before the yacht sank. In that binder, CIT was listed as an additional short and was entitled to receive notice of any changes in the policy. Not only was CIT not notified that the policy included a choice of law provision, CIT was completely eliminated from the policy, not given any notice of the policy. And Dr. Kaysen himself did not receive the policy until seven months into the term, had no opportunity to even see, let alone agree to, the choice of law provision. But you're a mortgagee. I mean, aren't you kind of stuck with what's there? I mean, there was a binder, and then a policy was issued. Once a policy is issued, the binder goes away. I don't know how you arrange that. Typically, that's true, Your Honor. We cited law in our brief, but that's not the case when a policy adds new provisions. A binder is a contract, just like any other contracts, Your Honor. And if the policy is issued, which materially changes the binder, then the terms of the binder, and not the policy, will prevail. But there's no mortgage clause. There's no standard mortgage clause here. Not in the policy. And what does additional assured mean? Well, we have a conflict in the binder. We have one reference to additional assured, and one reference to loss payee. I don't know what that means. It should have been addressed in the policy. It wasn't. And that was not Dr. Kaysen's fault. It was not CIT's fault. It was the insurance company's fault. It would be grossly unfair to allow an insurance company to unilaterally omit a mortgagee as either a standard or an open policy. You had a copy of the binder that showed that you were additional assured, as well as a loss payee. Correct. At the time that the funds were released to Kaysen? I'm sorry, what? When you issued the loan, you had a copy of the binder, too? That showed that you were in two different categories? Well, we issued the loan at the closing. Did you have a copy of the binder at the closing? No. We didn't attend the closing. I'd have to check the dates to see if the binder had been issued. Let me be more specific. Didn't you have a responsibility to check or inquire which status you were being considered for in the insurance, either the binder or the policy, since you were indicated as being a loss payee, as well as an additional insured? OK. Let me address that point. The ship was purchased in 1997, and that's when the closing occurred. This binder came up several years later. It was the third insurance policy on the yacht. So we would not have had the binder at the closing. Now, the binder was issued, and CIT obtained a policy of the binder. And then there is an internal ambiguity within the binding documents. There are a couple of things which suggest that we would be protected by the standard insurance clause. We were a mortgagee. The additional insured box was checked, and we were entitled to notice of cancellation of the policy under the binder and changes. Under New York law, a mortgagee is not protected as a loss payee unless there is a standard mortgage clause written into the insurance contract. Is that not the case? That is the case, and New York law was not in the binder. It was only in the policy, which omitted CIT unilaterally on AG. What law governs? Virgin Islands law. Why? Because there was no choice of law clause in the binder. But wait, wait. You're an insurance company. I mean, there's an insurance company here, and you're a Virgin Islands? We're a finance company. Right. But why would Virgin Islands law apply to your ability to collect on a follow-up insurance policy? Well, that's exhaustively discussed in the brief of Kaysen, and it's a choice of law analysis because the binder, the only thing that Kaysen had, which CIT never had, did not contain a choice of law clause. So absence of choice of law provision, we have to go through a choice of law analysis. Correct. And I'm asking why Virgin Islands should control CIT's rights as a mortgagee and or an insurance policy that is issued here. Because it has the closest contacts. It was a St. Thomas yacht. The contracts were entered into in St. Thomas. The yacht was in St. Thomas. The insurance agent was in St. Thomas, and it was a St. Thomas contract. And St. Thomas substantive law shows a preference that it governed the law of contracts issued by its licensed agents in the territory. But once a binder is replaced by a policy, the binder basically goes away. Yes, and that's- So the binder isn't there, so we have the policy, and we have to live with the policy. Yeah, that's generally true, and that's true under Virgin Islands law in other states as well. There is a big difference, though, if the terms of the insurance company add new, unagreed to provisions. And we've cited law to that effect. It's just unfair to allow one party to change a contract. Your binder here- I'm sorry. Your binder here puts you on notice. On page 307 of the appendix, the insurance is subject to the terms of the policies in current use by the company. This binder is canceled when replaced by a policy. Correct. It couldn't be any clearer. So what we're saying is, no, it wasn't canceled. It continues on. And you also see in that binder that CIT is entitled to notice of any changes in the policy. We never got it. We never even got the policy. Is your ability to recover dependent on Cason's ability to recover? Is your ability to recover dependent on Cason's status? No, it's not, Your Honor. In other words, it is claimed that he misrepresented the payment for the yacht in his application, various applications. So the insurance company has taken a position that this policy is void from the very beginning. Is that right? Correct. All right. Under Uber or Mayfede. And if we uphold that, of course, you can't recover, can you? First, you have to decide whether you want to apply Uber or Mayfede. If you do, then there's two more questions. One, did the insurance company's bad faith preclude it from being able to avoid the policy ab initio? And if we were to conclude that there is no bad faith? Then there is no bad faith, and you want to apply Uber or Mayfede, and all the facts are clear on summary judgment. There's no issues of material fact. That would mean that you have to show intent to deceive if we were to apply the federal admiralty standard. No, Your Honor, that's the difference. That's the Virgin Islands. That's Virgin Islands is intent to deceive. So if we apply Uber or Mayfede, any misrepresentation that is material would be sufficient to avoid the policy. That's correct. And there's several different tests for materiality, and I can discuss them. Let's say we were to conclude that this was a material representation. That is, he misstated the price he paid for the book. What if we were to come to that conclusion? Where would that leave CIT? Then you'd have to make another critical analysis, which the district court cited but did not apply. It's based on the Knight case. Would an objective standard, would a reasonable person in Dr. Kaysen's position have known that this was material? That's a Second Circuit view. That's the minority view. We've not adopted that, have we? The Third Circuit has not decided on Uber or Mayfede, much less a materiality test, much less a reasonable person test. The district court did cite the Knight case and then didn't even address that. So for that alone, it would be worth remanding for determination. Well, except we have no evidence. We have two affidavits here, Bishop and who's the other one? Usher. Usher and Bishop, to the effect that this was material and it was uncontroverted. There's no affidavit. There's nothing at all that would lead anyone to be able to conclude that it was not material. There's no fact. Why could we, on summary judgment, what is there? I mean, absent summary judgment, what is there to be decided in terms of an issue here? OK, I'd like to address two points on that, Your Honor. I see my time is up. May I continue? How much time do you reserve? Five minutes. All right, well, we'll take it down to four minutes for a rebuttal and give you another minute. Let me bring up two points. First, there are about five different tests for materiality, and the outcome depends on which one you use. Well, but here, what evidence do we have that it wasn't material? We have evidence that it was material. We have no evidence that it wasn't material. No, you have a lot of evidence that it's not material. What is that? You have two separate independent surveys saying that this is a $600,000 yacht, and even Mr. Usher's affidavit said it's the value that's at the issue here, not the purchase price, the value. And if I determine that the purchase price is lower than our unwritten policy of $500,000, I look into other matters to see whether there was a bargain. So even Mr. Usher is saying, you go beyond the purchase price. Now, I'd like to comment on the materiality test. The plaintiff, the insurance company, would like you to use a materiality test based upon just what the insurance company says is material. That's not a test at all, Your Honor. In 100% of the cases brought under Uberame FIDE, the insurance company is going to say, we consider this material. But isn't that important in terms of the premium that is going to be charged, as well as whether the risk is going to be assumed? Well, of course, depending on the value of the yacht, the insured value, the premium is going to be higher or lower. So there's an incentive either to inflate the value so that the recovery is higher, or to deflate the value so that the premium is lower. So isn't materiality viewed from the perspective of the insurer? I mean, isn't that appropriate? No, the appropriate test is the test in Knight, which said that if the alleged misrepresentation is something that would have controlled the insurer's decision, and that was cited by the district court as the proper test, that is far more fair than saying, having the insurance company make the call. Otherwise, as I said, the insurance company is going to say it's material in 100% of the cases.  is whether the plaintiff says it's material, that's not a test at all. All right, we'll hear from you on rebuttal. Thank you, Your Honor. Counsel? I believe we only had one argument. I don't believe Casson is arguing, is that correct? That's right, that's right. We were not able to get to him. Good morning. Good morning. My name is Greg Hodges. I'm here on behalf of AGS Marine and Transport. All right, could you pull the microphone a little bit closer, please? Thank you. Thank you, Your Honor. Your Honor, to address the point that you were asking, Your Honor. That's right. I'm not aware of what I did, but I'll just, oh, I'm sorry. Yeah, pull the mic, yeah, I don't know what's wrong. It's not the connection, maybe that's better. Your Honor asks about the choice of law provision in the policy itself, which is really one of the things that distinguishes this case from pretty much any other case that you've seen in the briefs. We have a policy here that not only incorporates what amounts to the ubermae fidei doctrine, but it effectively mandates the application of federal admiralty law when it can be applied, or New York law to the extent it can't be applied. Now, Attorney Bartsch suggests that, well, we issued a binder, and the binder can't be inconsistent with the policy. We didn't issue the binder. As the court found below, and as is supported by the unrebutted declarations of Usher and Bishop, that was a binder that was issued by Theodore Tunican Company, the agent, the exclusive agent of Dr. Kassin, and they had no authority to issue anything that affected the rights of AGF. Is that why you put in the, is that why binders have standard language about, you know, it's canceled as soon as a policy is issued, I guess? Absolutely, Your Honor, and the policy was, as the record will reflect, and I can point it out in the record, this policy provision was in the possession of Kassin's agent certainly as early as March of 2000 before our client agreed to bind coverage. What's the effect of, your adversary made an argument about they didn't receive any notice of the policy. What's your argument as to that argument by your adversary? They were entitled to it under the binder. If the binder were binding upon my client and it was authorized, they would have been entitled to notice, but as Mr. Usher's supplemental declaration clearly provides, after the fact, Tunick contacted AGF through T.L. Dallas and said, well, they missed the CIT on the application. Do you mind, in effect, adding them as lost payee? And as Mr. Usher said, I was going to address that. Ultimately, I didn't, but, you know, at best, they are lost payees. We don't mind if they're considered lost payees. Who covers the loss if they're, assuming no misrepresentation during the binder period? I'm sorry, who covers the loss? Yes, does AGP cover a loss during the binder period? Assuming no misrepresentation. If there were no misrepresentations, the loss would have been covered pursuant to the ordinary policies that would have applied under the circumstances given the course of dealing. I'm not sure I follow that. Does AGP cover the loss during the binder period? AGF, the ultimate insurer? AGF is the ultimate insurer. It's bound on behalf of AGF. It was bound, it was authorized to be bound in April when AGF faxed Tunick saying, you're authorized to bind it. Subsequently, a cover note, the only document along with the policy that was issued by AGF was issued by AGF, or T.L. Dallas on behalf of AGF. In that cover note, it specifically says additional insured loss payees as agreed. There was never any agreement to that effect as far as AGF is concerned. Your Honor's. The rest of the materiality aspect. Yes, Your Honor. Materiality is something that the court in the Inlet Fisheries case that was just decided this past February, the Ninth Circuit case that I think nicely addressed. As far as the materiality provision cited in the Knight case I would respectfully submit that the Knight case got that wrong as Professor Schoenbaum has indicated in his treatise. It shouldn't, given the definition of materiality, it shouldn't be what the insurer thought was reasonably material to the decision of the underwriter. It should be what a reasonably prudent underwriter considers material in the underwriting process. And that's what Professor Schoenbaum indicates. And quite frankly. Do we have evidence of what a reasonably prudent underwriter would consider here? Yes, we have the unrebutted declarations of Mr. Usher. And quite frankly, as we've cited in the cases, as Inlet Fisheries indicates, as the subsequent Ninth Circuit case S. Malloy that was decided in March of this year indicate, if you ask for information on an application, most courts determine that to be material as a matter of law. Well, but isn't it material to the risk? And I guess there is a question as to whether value of the ship, of the boat is material to the risk. Whereas if you only, if you paid 10 cents for it, because you were doing somebody a favor, but it's worth $10, nonetheless, if something happens to it, you're gonna have to pay $10. So why is the purchase price material to the risk? The purchase price is almost always determinative as Mr. Usher indicates in his declaration, particularly with respect to non-standard vessels, used vessel like this one. This was a 13-year-old vessel when Mr. or Dr. Kassin purchased the vessel. There is no ready blue book or yellow book that you can refer to for non-standard vessels like this. And when the application was submitted, what we were given, that is T.L. Dallas was given, the agent of AGF, was surveys that were over two years old. How would it have affected your decision if he had said, I pay $400,000 for the boat rather than 600,000? If he had said that he had paid $400,000 for the vessel as Mr. Usher indicates in his declaration, the first thing that would have come to mind would be, well, does this qualify for our insurance program since the minimum value for our program is $500,000? So the first thing he indicates that he would require is, first of all, some indication that improvements to make it worth more than five. So in the first instance, it might not be insurable. It, there would have been a red flag immediately if the application said $400,000. But how about if he had $200,000 in equity in the boat so that in fact it was worth $600,000 and there were two different assessments that said it was worth $600,000? Well, then under the circumstances, he would, first of all, if he had said, I wanna insure this for $600,000 but I only paid 400 because I already own a two-thirds interest, that would be a different story. That's something he did not disclose in his application, which he should have disclosed. And that would have, would that have changed the decision? Absolutely, because then at that point in time, the underwriters would have said, well, first of all, we need updated surveys and perhaps surveys that aren't provided by the applicant himself. Were the surveys sufficient to establish the value of $600,000? Your Honor, as I'm sure the court is aware, surveying is an inexact science. It depends on who you obtain to survey it, who pays for the survey, what the conditions that are requested. So the fact- Where are the surveys in the record and how old are they? I have some pages here. Do you know? Yes, Your Honor. Record sites. They appear throughout the record. I think there were two that I saw. The first one is in November 1995, I believe. First one appears at appendix page 244. It is dated November 21, 1997. When, as the court is aware, this transaction closed on December 4, 1990. I'm sorry, 1997. So it's a month. Oh, okay, but keep in mind, that's right, I forgot. My client didn't see this application until March of 2000. So at the time the application for coverage through AGF was submitted, this was over two years old. This was decided on summary judgment, wasn't it? Yes, Your Honor. And did the judge come to a conclusion, a factual determination of the price paid, or did he make certain assumptions? Yes, Your Honor. He didn't make certain assumptions. He found, as a matter of fact, that the only money or the only consideration that exchanged hands at the time of the purchase was the $400,000 that- Do you think that was appropriate for the judge rather than a jury, or further proceeding? Absolutely, Your Honor. As the Sasse-Moi case, for example, is a summary judgment case on the very issue that we have here, overstatement of value. In that case, you have a $150,000 overstatement. In this case, we have a $200,000 overstatement. What is there in the record about the ceded equity? I've never heard of someone ceding equity. I'll ask your colleague the same thing. What is there in the record to show that there was ownership before there was ownership? Your Honor, I must confess, when I first saw that ceded equity in his response, in Dr. Katzen's response to the interrogator, I resorted to my dictionary and tried to figure that out. We also submitted discovery to Dr. Katzen, asking him to explain that. The best that he did was to say, well, it was a component of the deal. Well, wait a minute. He said he owned a third of the boat. He said that in his application for a loan to CIT. That's the only, the ceded equity makes absolutely no sense when you're thinking of the transaction as between Dr. Katzen and Mr. Falk, the seller of the vessel. It only starts to make sense when you consider the ruse he pulled on CIT to get them to finance 100% of the vessel. There's no deed of a third of the boat anywhere in the record. No, Your Honor. In fact, the only matter of record is the bill of sale that we submitted as an exhibit to our motion for summary judgment that reflects that 100% of the vessel was conveyed when Magnus Falk conveyed the vessel to Dr. Katzen. Well, in any event, even if there were the ceded equity, there's no contention that he paid, this purchase price was anything more than 400,000. There's no, that it was ceded. There's no evidence that he paid anything for that. In fact, CIT, in their brief, concede that the only money that effectively changed hands was the $400,000, and then they refer to the ceded equity as what amounts to an instant rebate, which, of course, makes no sense. The bottom line is, the court correctly found that the only money that exchanged hands was $400,000. In Dr. Katzen's interrogatory responses and in his declarations in support of the opposition to the motion for summary judgment, the refrain that he keeps coming up with as far as the purchase price is it was $600,000 because the purchase agreement said it was $600,000. Can you clarify for me these dates? Because I have the insurance application here that stated March of 2002. Yes, Your Honor. That is, everybody concedes that that was a scrivener's error. Oh, okay, so it's 2000. It was 2000. But the transaction was November of 97, or December of 97? The, yes, Your Honor, the, keep in mind, this is the application, what amounts to the third application for insurance after Dr. Katzen purchased the vessel from Magnus Fock in December of 1997. So he purchased the vessel in 97 with the financing from CIT for $400,000. He operated it for a number of years. He, in March of 2000, he applied to my client for insurance representing. You had not been involved before? No, Your Honor. So this is the first application, and a survey from November of 97 was submitted? Yes, Your Honor. Could you address, time is very short, but the CIT's contention that it should be considered a lost payee, or an additional insured, because, first of all, they were deemed to be an additional insured on the binder. Yes, Your Honor. First of all, as Mr. Usher indicates in his declaration, while there's, we don't believe any binder that was issued by Tunick is binding on AGF because he's not our agent. We don't mind if they are considered bare lost payees, but that's not gonna help them. The binders that were issued by Kasson's agent, Theodore Tunick and Company, merely refer to, there is in the first binder, if you look at the appendix page 306, the first binder that is dated June 5th, 2000, it says in the bottom left hand corner, additional insureds, watercraft, liability as per schedule, please provide your own list, and in the boxes is checked additional insured. However, if you look at the attachments to 306, particularly page 308, it refers to CIT in the top left hand corner as a lost payee. The binder that were, for some reason, was issued by Tunick the following day, well not binder, it's evidence of property insurance dated June 6th, 2000. In this one, it checks the box lost payee, doesn't check the mortgagee box, doesn't check the additional insured box. Bottom line is, your honor, there is nothing, absolutely nothing in the record that AGF, excuse me, that CIT can point to that even hints that AGF ever agreed to consider them anything, much less more than a bare loss payee, as Mr. Usher indicates in his declaration. If they wanted standard union coverage, AGF doesn't even provide that in the first place, but they would have simply put it out to market. It seems inequitable because they're stuck because your insured made a misrepresentation on a policy, even though you were collecting premiums throughout this time. It seems unfair. I'm not saying that there's anything we can do about unfairness, but it seems inequitable. Are they able to get their own insurance separately? They can absolutely go. CIT could get insurance separate from being a lost payee on the insurance policy. And I would respectfully submit that, I think it was your honor's question, well, at the closing, did you have the binders? Did you make sure that you followed up and make sure you continue to have those binders? They didn't do that, your honor. They got snookered by Dr. Kasson. After the fact, all they get from his agent is something that shows that they're a lost payee. They were apparently satisfied with being nothing more than a bare lost payee. Thank you, Mr. Herrera. Thank you. Thank you. Ms. Bartsch? Ms. Bartsch, let me pick up where Judge Fuentes left off. When you have a, let's say that's a closing, bank is financing something, comes to the closing, let's say it's my house, isn't it really up to the bank, the mortgage company, to make sure that it is covered if there is a problem? Isn't that your obligation to make sure that whatever ducks there are are in a row so that you will be covered and get the money if there is a loss? At the closing, yes, your honor, and we did. This is the third insurance policy since 1997. All right, but even so, forget the closing then. Later on, isn't there an obligation to monitor and make sure that your mortgagee, your mortgagor, your debtor, has done whatever's necessary to make sure that if something happens, that you're gonna get the value of the collateral from the insurance company? Of course, that's a clause in virtually every mortgage insurance contract. When Dr. Kaysen applied to the insurance company, a binder was obtained, and we were listed as an additional insured. It's interesting, it's critical to note that on this insurance binder, the loss payee box is not checked, and the additional insured box is checked. But then shouldn't you have followed up when a policy was issued? Well. Shouldn't he have given you notice of this? The notice should have been given by the insurance company as the binder said it would. The binder, the language, which is contained in the appendix at page 309, says the policy is subject to the premiums. The company will give the additional interest identified below, and that's us, CIT, written notice, and will send notification of any changes of the policy that would affect the interest in accordance with the policy provisions that are recorded by law. That wasn't done, and it was AGF who didn't do it. And I'd like to address their allegation, obviously a factual issue, Your Honor, as to who was Tunick the agent of CIT and AGF. Inexplicably, the district court determined that Tunick was the sole agent of Dr. Kaysen, which makes absolutely no sense, since if Tunick was only Kaysen's agent, it could not have bound the insurance company, which it obviously did, because the insurance company had issued a binder, which under Virgin Islands law, the definition is agents are authorized to do contracts. Under Virgin Islands law, it's a question of fact to be decided, which the judge didn't decide. And finally, the only evidence from Tunick is a letter from Liz Mahoney on page 343 of the appendix saying, we are the authorized agent of your current underwriters. There is no evidence to support the court's conclusion that Tunick was somehow the sole agent of Dr. Kaysen, and it doesn't make any sense that he could be. Counsel, isn't your client's ability to recover contingent upon Kaysen's ability to recover? Not if CIT is protected by, no, by a standard mortgage clause. That's the difference between a standard mortgage clause. There is no standard mortgage clause at all. In the policy, no, there's not. But because that term was changed, the law is you cannot unilaterally cut someone out of a contract and then claim too bad. Which is exactly what they're doing here. And obviously any ambiguity is construed in favor of insurance, that's basic insurance law. We have a factual ambiguity in the binders. If CIT had been given notice, if they had been sent a policy, if they'd been told, look, you're a lost PE on the binder, but we're cutting you out of the policy, then that would have been a very different case. And to add insult to injury, we have Mr. Usher, who said Tunick sent him a letter later on saying, oh, you ought to put them in as a lost PE in the policy, but he ignored it. So CIT has, CIT didn't even know the policy had been issued, let alone that they had been cut out of it. Was the policy that was ultimately issued a standard insurance policy for this type of coverage? I don't know what would be considered a standard insurance policy for this coverage. It certainly did not include them as a lost PE as the binders said it would. Was a policy ever available to CIT or Kaysen to inspect prior to its issuance? Well, the policy was issued in October of 2000. The boat sank in November of 2000. Certainly CIT never got it, and even Dr. Kaysen didn't get it until seven months into the policy period where he had absolutely no ability to negotiate any of the terms. Never signed it, never had any opportunity to. So he was basically stuck with it. And in these cases, the courts have said that insurance contracts or contracts of adhesion, unless you agree to the change, can't be held to it. And certainly CIT, which never even saw it, could be held to it. Let me make one thing clear. You acknowledge there is no standard clause, but your view is that the caseload support you're being considered as a standard clause. Is that right? Correct, and that's because it's AGF's fault, not CIT's fault, that CIT was unilaterally omitted from the policy. And there is factual evidence on the record indicating that CIT is an additional assured, and it was entitled to notice before policy changes and notice of cancellation. All factors that indicate standard mortgage coverage. I gather CIT didn't make arrangements to insure itself other than through the insured in this case? How could it? It would be like you insuring, getting insurance on my house. It's no different. When you purchase a house, the mortgage that you get always says that you have the obligation. Okay, thank you very much. Thank you, Your Honor. Thank you, counsel. Case is well argued. We'll take it under advisement. Full error.